## A99A1007. CRENSHAW v. THE STATE.
(515 SE2d 642)

ELDRIDGE, Judge.

A Spalding County jury found Walter Herman Crenshaw guilty of stalking. He appeals the conviction, and we affirm.

In a light most favorable to upholding the jury's verdict,[1] the evidence shows that the victim, Vickie Kurlinski, knew Walter Crenshaw because she had been in the second grade with Crenshaw's son. Over the years, she saw Crenshaw only in passing. However, when she was 14 years old, Kurlinski began to see Crenshaw wherever she looked: across the street, at the store, at the post office, beside her house. At age fifteen, she started receiving telephone calls at two or three o'clock in the morning from a man who called himself "Dave"; he told her things like he "wanted to pour champagne all over [her] body and lick it off." Several weeks after the telephone calls began, Crenshaw stopped his car beside Kurlinski to speak to her. She instantly recognized his voice as that of "Dave." Kurlinski confronted Crenshaw, telling him "point blank, I know who you are." The telephone calls from "Dave" ceased.

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

Vickie Kurlinski received a car for her sixteenth birthday. Thereafter, Crenshaw, driving his silver Plymouth Horizon, followed behind her car on a routine basis. Often, when Kurlinski reached her destination, Crenshaw would exit his own vehicle and walk with her. This conduct halted temporarily when Kurlinski "threw a fit in public in one of the stores [the local Winn-Dixie]. . . . I started screaming at him. I screamed at him to stay away from me, not to come near me again, to leave me alone. . . . It was successful for maybe three weeks." After which time, Crenshaw continued to follow her.

Kurlinski married at age 18. She moved from her parents' home in Spalding County to Friendship Circle Road in Pike County, and contact with Crenshaw temporarily ceased. However, several years later, when she was pregnant with her son, Crenshaw approached Vickie Kurlinski in a local Pike County Wal-Mart. He walked around the store with her, touching her, and "asking if [she] was okay." Thereafter, Crenshaw's contact with Kurlinski became more frequent. Crenshaw telephoned her and wrote her letters. Crenshaw began driving up and down Friendship Circle in front of her house.

In 1996, Kurlinski separated from her husband and moved back into her parents' house in Spalding County. Crenshaw's activities increased. He would drive by her house "so many times" every day. He would follow her whenever she left her parents' home. Sometimes he would try to approach her and speak. He "would want to touch. He would want to pat you like he'd known you all his life. He would be patting and touching. And he would pat and touch my child. He would handle my child." Other times Crenshaw would just follow her. Kurlinski told him to stay away; she created scenes in public: "I screamed at him in Wal-Mart, I did. I screamed." Thereafter, Kurlinski's car was "keyed"[2] in the parking lot of the Wal-Mart.

For many years Crenshaw's actions had put Kurlinski in fear for her safety. However, she also became afraid for the safety of her child. While still in Pike County, she contacted the Pike County Sheriff's Department. During an investigation, a Pike County deputy found Crenshaw's car parked in front of Kurlinski's house on Friendship Circle.

When Kurlinski moved back to her parents' house, a Spalding County Sheriff's Deputy investigated a report of "an altercation between Mr. Crenshaw and Mrs. Kurlinski[.]" During the deputy's interview with Vickie Kurlinski, "she then told [him] the story about being harassed over the past several years." Crenshaw denied the allegations: "[h]e stated that she was harassing him."

The deputy began an investigation. One evening, he put Kurlin-

---

[2] A scratch on a vehicle often created by scraping a metal key on the body of the vehicle.

ski's house under surveillance and saw Crenshaw drive past her house several times. On another day, the deputy followed Kurlinski to the local K-Mart. As the deputy left Kurlinski's residence, he saw Crenshaw's car circle around in front of Kurlinski's house. Thereafter, he spotted Crenshaw's car "cruising around the K-Mart parking lot. [Crenshaw] went by Mrs. Kurlinski's vehicle twice. . . . He would stop in front of it and then start back. He'd cruise through again, did the same." Later, when Kurlinski drove out of the K-Mart parking lot, Crenshaw followed her.

Finally, on another evening, the deputy saw Crenshaw follow Kurlinski to the local Wal-Mart and circle the parking lot twice, stopping in front of Kurlinski's car each time. During that incident, Crenshaw ultimately parked his car "where he could view her vehicle." Again, Crenshaw left the store parking lot at the same time as Kurlinski. Crenshaw was arrested and charged with stalking.

At trial, the State introduced similar transaction testimony from two women who had also been harassed by Crenshaw. Heather Pruitt testified that Crenshaw approached her in a local Spalding County Food Depot while she was shopping with her young son. He began talking to Pruitt non-stop. Crenshaw followed her around the store, talking. "It was almost as if he felt like he was our family or something. He continued to rub [m]y son's back and just talk and talk; you know touch me on the arm and just, you know, trying to act like buddy-buddy with me." Pruitt was "very creeped out by it." Thereafter, Crenshaw left the store before Pruitt and was circling the parking lot as Pruitt entered her car. Crenshaw followed Pruitt home. He drove slowly up and down the road in front of her house. Pruitt called the Sheriff's Department and reported Crenshaw's actions. A few months later, Crenshaw approached Pruitt in the Wal-Mart. He followed her throughout the store, talking. Several days later, Pruitt again saw Crenshaw following her through Wal-Mart. He drove past her in the Wal-Mart parking lot as she was leaving. Pruitt got the tag number of Crenshaw's car and called the Sheriff's Department. "And I said I got his tag number; he's been following me around in Wal-Mart; you know, I'm terrified. And so they ran his tag number. And that's how I got linked up with this case[.]"

The other similar transaction witness, 18-year-old Renee Moore, testified that when she was "younger," she and her friends would go to McDonald's restaurant, "and. he'd always be sitting in there. And he would always, you know talk to me; be real friendly. But he'd always offer me money, like do you need any money to go watch a movie; do you need any money to play any games or anything." In February 1996, Moore started working in the local Winn-Dixie.

He would come in there once a week maybe. Just — He'd

always come through my line. And he'd always talk to me. He'd always pat me, rub my arm, pat me on the shoulder. And he'd — He knew that I had a new car when I got my car. And I asked him how he knew. He said he seen it sitting in front of my house. And I looked, you know, how do you — . . . And, you know, kind of made me think, you know, how did he know where I live and everything.

After Moore got a car, Crenshaw began following her. Moore would see Crenshaw's car behind her and deliberately drive in another direction in order to see if he would follow her. He did. Crenshaw also began to come into the Winn-Dixie more often. Moore would hide in the office. After Crenshaw called her parents' house to wish her a happy birthday, Moore and her family contacted the Sheriff's Department. *Held*:

1. We find the evidence sufficient for a rational trier of fact to have found Crenshaw guilty beyond a reasonable doubt of stalking Vickie Kurlinski. *Jackson v. Virginia*, supra.

2. Crenshaw contends that (a) the State failed to articulate a proper purpose for the introduction of the similar transaction evidence and, thus, (b) the trial court failed to limit the jury's consideration of such evidence to the sole purpose for which it had been admitted. This contention is meritless.

(a) At the Rule 31.3 hearing, the prosecutor stated that the similar transaction incidents were "almost identical." After articulating the similarity between Crenshaw's conduct in the case-in-chief and the independent incidents, the prosecutor stated, "These are all following the same kind of touching conduct, the same type of frightening conduct that this man does on a regular basis." Following the admission of the evidence, the prosecutor then reiterated that "I believe we can go through basically the same evidence we did because it's a course of conduct." The demonstration of a similar course of conduct is a proper purpose for the admission of similar transaction evidence. See, e.g., *Norris v. State*, 230 Ga. App. 492, 493 (1) (496 SE2d 781) (1998).

(b)

"[A] defendant's failure to request an instruction limiting the jury's consideration of extrinsic act evidence to the purpose(s) for which the evidence was admitted at the [Rule] 31.3 hearing precludes a finding of reversible error in the trial court's failure to limit its instruction sua sponte. . . . Because [Crenshaw] did not submit a request to charge limiting the jury's consideration of the extrinsic act evidence,

the trial court did not err in failing to limit the jury's consideration any more than it did.

*Murphy v. State*, 270 Ga. 72, 75 (508 SE2d 399) (1998). See also *State v. Belt*, 269 Ga. 763 (505 SE2d 1) (1998).

3. Crenshaw complains that the trial court did not ask for exceptions at the conclusion of the jury charges. However, a trial court's failure to inquire of counsel whether there are exceptions to the charge does not result in reversible error. It results in a non-waiver of jury charge issues on appeal. *Lumpkin v. State*, 249 Ga. 834 (295 SE2d 86) (1982); *Jackson v. State*, 246 Ga. 459 (271 SE2d 855) (1980). Clearly, such result does not prejudice a defendant. In any event, we note that Crenshaw has not identified any error in the charge that would have merited an exception in the first place.

*Judgment affirmed. Pope, P. J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED APRIL 6, 1999.

*Lee Sexton*, for appellant.
*Newton & Howell, Griffin E. Howell III*, for appellee.